G-eoghegan, J..
Heard on motion for a new trial.
The evidence in tbis case disclosed that tbe plaintiff and the defendant were adjoining proprietors of premises on the west *376 side of Freeman avenue, south of Gest street, in the city of Cincinnati. The plaintiff’s premises consisted of a two and a half story brick building upon a lot twenty feet front, lying immediately north of the premises of the defendant, which extended southwardly from the plaintiff’s south line for some considerable distance and which premises were used by the defendant for brewery purposes.
The cellar under, the premises of plaintiff was nine feet in depth. Immediately adjoining these premises, and under that portion of the brewery property known as the driveway, the defendant company maintained a cellar which whs some eighteen or twenty feet in depth, and along the north line of said cellar ,and immediately adjoining the south line of the plaintiff it had constructed a stone wall. Between this stone wall and the south wall of the plaintiff’s cellar was a small strip of ground, over" the surface of which the tenants of the plaintiff secured access to the upstairs rooms of her building. Immediately south of the cellar under the driveway, which was referred to during the course of the trial as the driveway cellar, the defendant company had constructed two cellars, that is, a cellar and a sub-cellar. The floor of the cellar was somewhat higher than the floor of the driveway cellar, while the floor of the sub-cellar was lower. There were several other cellars in the premises of the defendant and in the sub-cellar was constructed a large well. Most of the cellars of the defendant company were lower than the level of the public sewer in Freeman avenue, and therefore it was impossible to drain the cellars into the sewer.
It was necessary in the management of the defendant’s business to keep these cellars very clean, and consequently a considerable amount of water was used in washing the floors. Now, as this water could not be carried to the sewer, it was, -by a system of surface drains and gutters in the various cellars, conducted to the well or tank above described, and there by means of a syphon carried out to Fillmore street, in the rear of the brewery property. In the driveway cellar, as well as in several of the other cellars, were kept large casks of beer and it was necessary that the temperature be kept at a certain degree in *377 order that the beer be not spoiled. In order that the water which was used for various purposes might escape from the driveway cellar, it was carried by means of gutters in the floor to a point near the south wall of the said driveway cellar and from that point by means of .an iron pipe downward into the sub-cellar next adjoining, and thence by means of gutters to the well or tank above described, and whenever this well or tank became nearly full, the syphon was put to work and the water •was pumped out.
The soil of the territory surrounding and upon which the improvements of the plaintiff and defendant were placed was a sandy river deposit. The premises as they have been described had existed, prior to the time complained of in the petition, in the same state for a number of years.
About the end of March, 1913, the Ohio river was visited by a very great flood, the largest in that river for ,a number of years preceding, and on or about the 31st day of March, owing to the gradual rise of the river, the water was caused to back up in the various sewers and it soon began to make its appearance in the cellar of the plaintiff, as well as the cellar of the defendant. The defendant, for the purpose of protecting its property, caused the drains in those parts of its cellar which could be connected with the public sewer in Freeman avenue to be plugged up so that the water backing up through the sewer could not force its way into the cellars of the defendant and cause damage to the beer .and other material stored therein. It was noticed, however, that the water was seeping through the wall on the north side of the driveway cellar, which immediately adjoined plaintiff’s property and this was seen coming through at a point .about three and a half feet above the level of the cellar floor, which, of course, was some distance below the level of the floor of plaintiff’s cellar. An attempt was made to stop this by putting oakum and other substances in between the masonry of the wall where the water was coming in, but the water kept coming in, and being carried to the well or tank above described, it was soon found that the syphon ordinarily 'in use could not carry it away fast enough and another syphon was ultimately installed and finally a pump was installed, so *378 that the water might be carried away from the tank as fast as it came in. It was also noticed that the water as it came through carried with it small portions of sand and that this sand, being carried over to the point where the drain pipe which led to the sub-cellar was, soon clogged the pipe so that it became necessary to break it in order to let the water through.
On the morning of March 31, 1913, about two o’clock, the property of the plaintiff began to sink, and sometime thereafter the side of the building nearest the property of the defendant’ collapsed. .Shortly after the time that the building of plaintiff started to. settle, someone who had been, sleeping in the building went to the engineer of the brewery and told him to cease pumping as it was causing the building of the plaintiff to sink. However, the pumping was continued until the next morning, when it was stopped.
The next morning it appeared that the cement floor which was laid in the driveway cellar had been forced up and there was a large hole therein through which water and sand were coming and, being carried off to the tank, was being pumped out to the street.
It is upon these facts that the plaintiff sought to recover damages from the defendant company because of the alleged negligence of the defendant company in permitting the water to come through the wall and in pumping the said water out of its cellar.
The only evidence offered as to the cause of the collapse was the evidence offered by an expert engineer, Professor Marks, wherein he stated that the collapse was due to the fact that the water accumulating in the cellar of the plaintiff caused a hydrostatic pressure downward and sidewise, and that the water not being permitted to .accumulate in the cellar of the defendant there was no. hydrostatic pressure either- downward or sidewise to counterbalance the pressure from the other side, and that by reason of this the soil under plaintiff’s property, not being able to resist the pressure, was forced downward and sidewise and upward through the cellar floor of the defendant, and the support or foundation of plaintiff’s building being removed the foundation fell in and collapsed. The evidence *379 shows, that the wall which had been constructed by the defendant on the north side of its driveway cellar is still standing in the same condition and there is no evidence to show that the wall was not sufficient to support both the ground and the building of the plaintiff under ordinary conditions.
The evidence being substantially as indicated above, at the close of plaintiff’s ease a motion to direct the jury to return a verdict for the defendant was granted, and the plaintiff now claims that 'the court erred in granting said motion.
In support of his contention, counsel for plaintiff cites a number of cases, all of which, under varying facts, support the doctrine laid down in Fletcher v. Rylands, 1 L. R. Exeh., 265, wherein the principle was enunciated that one who for his own purposes brings upon his land and collects and keeps there anything likely to do mischief if it escapes, is prima facie answerable for all the damage which is the natural consequence of its escape.-
It will be seen at a first glance that there is .a wide distinction between one collecting on his land something that is likely to do mischief if it escapes, and one who attempts to relieve himself of certain damage by removing that which is likely to cause the damage and will cause it, even though it may be that in doing so he incidentally causes damage to his neighbor.
Granting for the moment the proposition that the evidence supports the allegations of plaintiff’s petition, of which the court is not altogether sure, because the allegation of plaintiff’s petition is such as would lead one to believe that the pumps sucked the sand from under the plaintiff’s building, whereas in truth the evidence does not show that the pumps were any where near the plaintiff’s building, it does not seem that the doctrine that one must use his own so as not to injure another has any application to the present case. It is not at all clear how the water accumulated in the cellar of the plaintiff, but it undoubtedly came there by reason of the fact that it was caused by the constantly rising river backing up through the drain pipes of plaintiff’s premises from the sewer in the street, or that it seeped in from adjacent cellars on the north.
*380 Under ordinary conditions, if plaintiff permitted a volume of water to accumulate in his cellar and did not take care of it, but permitted it to seep through the wall and to cause damage to the defendant, then plaintiff would have been liable herself, under the doctrine of Fletcher v. Rylands, for any damage that she caused to the defendant, unless she was able to show that the water was caused to accumulate in her cellar by the act of Cod.
Of course, in this case it must be conceded that the flood in the Ohio river, in 1913, was an act of God, and that therefore even though she had permitted the water to accumulate in her cellar, she could not be held liable if it escaped and damaged the property of the defendant. At least we can assumé in that case it would so be held.
Blut it would seem more than passing strange that defendant should be held liable under the same circumstances, because it took such means as it thought was necessary in order to relieve itself of the water that was coming in upon it and which would have caused it great damage. It must be remembered in this connection that there is no proof that the operation of the pumps themselves exercised any injurious influences upon the soil underlying the property of the plaintiff, but her own expert, and he is the only witness who offers an explanation of what caused the damage to plaintiff’s property, said it was the failure of the defendant to permit the water to rise in its cellar and thus equalize the hydrostatic pressure which was exerted downward and sidewise from the property of the plaintiff.
An examination of the American cases, which counsel for plaintiff cites in support of his theory that if any damage resulted to plaintiff’s property by the removal of the water from defendant’s cellar, defendant would be liable therefor, will clearly show that in all of these cases the defendants, either by the maintaining of nuisances or the erecting of works which changed the natural condition of things, caused damage to the plaintiff’s property; and there is no case where, under circumstances such as we have here the defendant was held liable be *381 cause of attempts ou his part to protect himself and his property from damage caused by extraordinary events.
In Cahill v. Eastman, 18 Minn., 324, and Klapheide v. Eastman, 20 Minn., 478, two eases that arose out of the same state of facts, the digging of a tunnel by the defendants caused the water of the Mississippi river to rush through and to damage the property of the plaintiffs, and the court held that by the manner of the building of the tunnel a nuisance was created and that the principle laid down in Fletcher v. Rylands applied.
In Gerrish v. Clough, 48 N. H.; 1, a breakwater ivas built by a riparian owner in such a.manner as to wash away the land of his opposite neighbor and to flood that of his neighbor above, and it was held that while he had a perfect right to build a breakwater to protect his own land, that the building of it in such a way as to cause damage to his neighbors, which they would not otherwise have suffered except for its building, was the creating of a nuisance for which he was liable.
In Valley Railroad Company v. Frans, 43 Ohio St., 623, the railway company diverted a stream and by doing so caused damage to the land of the plaintiff by putting in action a force of water against his property, which would not have existed except for the diversion of the stream. There was not much contest about the liability in this case, the decision turning largely upon the plea of the statute of limitations as a bar to the action.
In Coal & Iron Company v. Tucker, 48 Ohio St., 41, the placing of slag from a mine on the bank of a stream where it was likely to wash, and did wash, causing a damage by reason of an overflow to the lands of a riparian owner below, was held to have created a liability. This was so because of the fact that the placing of the slag in such ,a position created a nuisance, and the court was evidently influenced to a considerable extent by the fact that there was a statute which provided that private persons who did acts of this kind could be punished criminally.
The case of Defiance Water Company v. Ollinger, 54 Ohio St., 536, which was a case where a stand pipe full of water was *382 permitted to become out of repair and shaky, with the result that it collapsed, causing personal injuries to the plaintiff, was held to be directly within the rule laid down in Fletcher v. Rylands.
The case of Cork v. Blossom, 162 Mass., 330, and the case of Railway v. Bom, 76 8. W., 350, are eases where states of facts similar to those found in the cases above cited were held to have created a liability.
But, it will be seen that all of these cases turn upon the question of maintaining a nuisance, or upon a direct trespass, and in none of these cases is it held that because a man protects himself against something that is a common enemy to him and all his neighbors he is liable for a damage that might in any way be incidental to his act of protection.
I am inclined to think that the doctrine laid down in Rex v. Commissioners, 8 Barn. & Ores., 355, is the doctrine that should be applied to this case, and it was largely upon that doctrine that the motion for a directed verdict was granted.
In that case the commissioners of sewers for the levels of Pagharn had caused to be taken down certain groynes and other works which had been before erected to protect the levels against the inroads of the sea, and had erected certain other works in their place. The effect of this work was to cause the sea to flow with increased force against the land of one Cosens, and in consequence thereof his land had been gradually washed aw.ay, which reduced his property considerably in value. He claimed that the commissioners should compensate him as for land taken and that they should summon a jury to ascertain the expense. Lord Tenterden in deciding the case, after admitting that the effect of the work of the commissioners was to cause the damage complained of, said:
“But the sea is a common enemy to all proprietors on that part of the coast, and I can not see that the commissioners, acting for the common interest of several land owners, are, as to this question, in a different situation from any individual proprietor. Now, is there any authority for saying that any proprietor of land exposed to the inroads of the sea, may not en *383 deavor to protect himself by erecting groyne or other reasonable defense, although it may render it necessary for the owner of adjoining land to do the like? I certainly am not aware of any authority or principle of law which can prevent him from doing so. * * * I am, therefore, of the opinion that the only safe rule to lay down is this, that each land owner for himself, * * * may fereet sijch defenses for the land under their care as the necessity of the case requires, leaving it to others, in like manner, to protect themselves against the common enemy.”
Now, there is no doubt but that the flood of the Ohio river, in March, 1913, was the common enemy of all persons who were or might become subject to the invasion of its waters. Each owner had the right to make such efforts to prevent damage by the flood as the necessity of the occasion required, subject, however, to the principle that he must regard the rights of his neighbors in doing the work and not by his negligence cause them damage; but I can not conceive how -the rule that requires one in the doing of work upon his own premises to regard the rights of his neighbors can be carried so far as to compel him to 'allow a large body of water to remain on his premises which might result in severe damage, in order to counter-balance the hydrostatic pressure that is exerted upon his neighbor’s subsoil, where that neighbor has taken no means to prevent the water coming in upon her premises.
This same principle has been laid down, under similar facts, in Lamb v. Reclamation Dist., 73 Cal., 135; Hoard v. Des Moines, 62 Iowa, 326; Turnpike Company v. Green, 99 Ind., 205; Railroad v. Stevens, 73 Ind., 278; Bass v. State, 34 La. Ann., 494; Dubose v. Commissioners, 11 La. Ann., 165.
In Lamb v. Reclamation Dist., supra, the court, at page 131, referring to the principle laid down in Rex v. Commissioners, supra, say:
“Logically this principle would seem to be applicable to the waters of large navigable American rivers subject to extensive overflows, and it has been thus made applicable in a number of adjudicated cases.”
*384 Counsel for plaintiff seems to think that he has some right of action because of the provision of Section 3782, General Code, that if the owner of land exeavates to a greater depth than nine feet below the curb of streets and causes any damage to any building upon the lots adjoining, such owner shall be liable to the party injured to the |ull amount of such damage.
I can not see now, and never have been able to see, the application of this statute to the facts of the present case. There is no evidence here to show that the excavation of the driveway cellar was the cause of damage complained of herein. As a matter of fact, the evidence shows that the wall which was erected next adjoining plaintiff’s property is still standing and has been standing for a great number of years and is amply sufficient to furnish lateral support to the property of plaintiff. It was not the manner in which the excavation was made upon the defendant’s premises, nor the depth of its cellar, that caused the damage, but it was the failure to permit the water to rise in -the cellar so that the hydrostatic pressure might be equalized that was the direct cause of whatever damage plaintiff sustained, and in view of the authorities, it does not seem that this would create a liability for which damages might be had.
Therefore, I am of the opinion that there was no error in directing a verdict for the defendant, and the motion for a new trial will be overruled.